## Case No. 14,026.

### TIERNAN v. ANDREWS.

[4 Wash. C. C. 564.] [1]

Circuit Court, E. D. Pennsylvania.    Oct. Term, 1825.

PRINCIPAL AND AGENT — MONEY PAID TO USE OF PRINCIPAL—JUDGMENT—SURETY.

1. A, of France, appoints B his general agent in the United States, and authorises him, amongst other things, to dispose of an imperial license, and to reserve to A the consignments of the cargoes shipped under it by the purchaser. A shipment is made by D (who bought the license under an agreement stipulating the commissions to be received by A) to A, between whom a dispute afterwards arose as to the construction of the agreement, which resulted in a suit by D against B, for a breach of the agreement by A. The plaintiff became bail for B, and surety in an injunction and appeal bond, and was finally bound to pay the sum which D had recovered against B; for which this suit "for money paid and advanced," was brought against A, the principal. The plaintiff is entitled to recover. It is immaterial whether the judgment against B was just or unjust, or was obtained by the neglect or fault of B.

2. When the principal is liable upon a sale to an agent, and when not.

This was an action of assumpsit [by Luke Tiernan against Robert Andrews] for money laid out, and advanced for the defendant at his request.

Peters & Chauncey, for plaintiff.
Sergeant & Binney, for defendant.

WASHINGTON, Circuit Justice. Sometime about the latter end of the year 1811, or beginning of 1812, John Andrews, brother of the defendant, made his appearance in Baltimore, with a power of attorney from the defendant, constituting him his general agent and attorney in the United States, with very extensive powers; and also letters of introduction to sundry merchants of that city, and amongst others, to Luke Tiernan & Co. of which firm the plaintiff was a member; announcing to them that the said Andrews was appointed by the writer his general agent in the United States, and requesting their kind services to him when necessary. On the 16th of April, 1812, the defendant wrote to his brother, and directed him to apply to L. Tiernan & Co. for an imperial license in their possession, the property of the writer, which he was to sell for not less than $1,500, and also to secure to him the consignment of the cargoes which might be shipped under its sanction, and intimating a wish that it might be disposed of to William and James Bosley, for at least one-half. On the 2d of October in the same year, John Andrews entered into a contract under seal with William and James Bosley, by which, in consideration of the sum of $1800, and of a commission of two and a half per cent. on the gross sales, and the same on the returns, he sold him the said imperial

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

license in the name of Robert Andrews; on the arrival of the vessel in France, Mr. R. Andrews to do the business of said vessel, and to charge five per cent. commission on the gross sales, and two and a half per cent. on returns; the two and a half per cent. on gross sales which he is to charge above his commissions, the said Robert Andrews to credit and pay over to said William and James Bosley. This instrument was signed and sealed by John Andrews, in his own name. The $1800 received by John Andrews by the sale of the above permit, was afterwards placed by the defendant to his debit in account. On the 10th of the month last mentioned, John Andrews wrote to his brother, and informed him of the contract, enclosing at the same time a copy of it, and stating to him that a valuable cargo in the Ned would be shipped to him by the Bosleys. James Bosley, one of the members of this house, accompanied the cargo in the Ned to Bordeaux, the place of the defendant's residence; and it would appear by a letter from the defendant to John Andrews of the 13th of March, 1813, that a difference had arisen between those parties respecting the construction of the contract; the defendant contending that he was entitled to charge a commission on the freight of the Ned collected by him, and Bosley insisting that this was a part of the business of the vessel, which he was bound by the contract to do, and for which no compensation was provided. After some correspondence, however, between the parties, this claim was given up by the defendant, which he announced to the Bosleys in July, 1813.

In September, 1813, the Bosleys brought an action of covenant upon the contract, and the breach laid in the declaration was, the refusal of Robert Andrews to pay over to or to credit the plaintiffs in that suit, the two and a half per cent. on the gross sales of the cargo by the Ned. In that action the present plaintiff became special bail for John Andrews, and on the 9th of May, 1815, during the absence of John Andrews from the United States, judgment was confessed by his attorney for the sum of $3547, under an agreement that it should be credited with any payments which might be made to appear to the satisfaction of a Mr. Brown, within four months thereafter. Upon the return of John Andrews in the November following, he was served with an execution, and for the purpose of superseding the judgment for six months, in order to get time to apply for an injunction, the plaintiff, together with Mr. Owen, became, at the request of John Andrews, his sureties, and, together with John Andrews, confessed judgment before a magistrate for the above sum of $3547. This mode of proceeding appears to be in conformity with the laws of Maryland, where the said judgment was obtained. In pursuance of the plan thus adopted by John Andrews, for having the merits of this judgment inquired into in the court of chancery, an injunction was applied

for and granted in June, 1816, the plaintiff entering himself a surety in the injunction bond. After sundry proceedings in that court, a commission to Bordeaux, a reference to the auditor of the accounts between Robert Andrews and the Bosleys, and a report thereon; the injunction was dissolved, and the bill dismissed in February, 1822. This was followed by an execution, which was levied on the plaintiff's property; and which was returned satisfied by him.

The only question of law upon these facts is, whether the money so paid by the plaintiff, was money laid out and advanced for the defendant, and at his request? That it was paid to satisfy a debt due by the defendant, is undeniable. The permit sold by John Andrews to the Bosleys was the property of the defendant, was sold by his orders, and he received the fruits of it, not only the $1800 which were paid, but the consignments which constituted a part of the consideration. The suit against John Andrews was founded on the contract entered into for the sale of that property, and the ground of the action against John Andrews was the non-payment by the defendant of the two and a half per cent. on the gross sales, or his refusal to give the Bosleys credit for them. The debt recovered therefore in that action, and paid by the plaintiff, was the defendant's debt, and by such payment the defendant was discharged from the claim of the Bosleys. If any further evidence of this fact were necessary, the defendant's letters, hereafter to be noticed, acknowledging himself to be the real party interested in the suit, would abundantly supply it. Not only was this money paid by the plaintiff for the use of the defendant, but, if there were nothing else in the case but what has been stated, it would unquestionably have been paid at the request of the defendant; because it was at the request of his agent that the plaintiff was brought into the predicament of being compelled by legal process to pay it; and it is quite immaterial whether his being in this predicament was communicated or not by the plaintiff, or by John Andrews, to the defendant, since John Andrews had undeniably the power, and it was a part of the duty he owed to his principal, to take all legal means to enable him to defend his rights, and to obtain bail or sureties, if necessary, for that purpose. If all this be so, this action might clearly be maintained on the above evidence; unless the defendant's counsel have succeeded in proving, that where an agent contracts in his own name, and the principal is known at the time to the person with whom he contracts, an action will not lie against the principal. The cases relied on to establish the proposition are the following: Schmaling v. Tomlinson, 1 Marsh. 500, where it is held, that if A, on the recommendation of his agent, employs B to do a particular piece of business, and B, without A's knowledge, employs C to do it, there is no privity between A and C, and consequently C cannot maintain an action against A to recover compensation for his services, though he had not paid over the money to B. This is the case of a limited, special agency, where the confidence of the principal was given to a person of his own choice, to do a particular business, without his being entrusted with a power, express or implied, to entrust the business to a sub-agent, or in any manner to delegate his trust to another. C then was the agent of B, but not of A, and consequently there was no privity between A and C. This is altogether unlike the present case, since John Andrews had a power to contract with the plaintiff to become his surety, to enable him to vindicate, in a court of justice, the rights of his principal. The case of Cartwright v. Hately [3 Brown, Ch. 238] is in principle the same as the above. The principle decided in the case of Paterson v. Grandasequi, 15 East, 62, is, that where a sale is made to an agent, whose principal is known to the seller at the time, and yet the seller elects to give credit to the agent, he must be taken to abandon his recourse against the principal, and can not afterwards charge him. But if the principal be unknown to the vendor at the time of sale; when the principal is discovered, he, or the agent may be sued at the election of the vendor, unless the usage of the trade confines the claim to the agent. Without stopping to examine this case, for the purpose of expressing our approbation or disapprobation of the principle on which it is founded, it may be sufficient to observe that it might have applied, had this been an action of the Bosleys against the defendant, but that it is totally inapplicable to the case of a surety, who becomes so, at the request of a general agent, to enable him to defend a suit which substantially concerns his principal, although he is the nominal agent. Where, in such a case, can we discover that election to give credit to the agent, which can be construed into a waiver of his recourse against the principal? If he become a surety at all, it could be only for the agent, the nominal defendant, although eventually it was to benefit the principal. Upon the facts stated then, there seems to be no ground for saying that this action cannot be maintained against the principal.

But it is insisted that after the 7th of January, 1815, when John Andrews executed a letter of substitution to Luke Tiernan, vesting in him all his powers as the defendant's attorney (which he had power to do), the agency of John Andrews ceased, and that from that period, he had no authority to enter into any collateral or other contract which could create a privity between the defendant and the plaintiff as surety, although in a case in which the defendant was interested. Without stopping to inquire in the effect of this substitution upon the power of attorney, under the particular circumstances which attended that transaction, I shall consider the case as if the power of attorney were at an end from the 7th of January, 1815. How will the case then stand? In the first place, we have the

letter of introduction from the defendant to Luke Tiernan & Co. informing them that John Andrews would act as his general agent in the United States, and requesting in his favour their kind services. In the next place, the special order of the defendant to this agent, thus announced, to apply to those gentlemen for the imperial permit, and to dispose of the same on certain terms, which order was complied with. After this, we have repeated recognitions by the defendant, of John Andrews's agency in this particular transaction, accompanied by orders to attend to the suit, and to defend the interest of the defendant. On the 22d of November, 1815, John Andrews wrote to his brother, informing him that his account current had been received, but too late for the purpose for which it had been wanted. That the Bosleys had obtained judgment for $3500, the amount they claimed, "and which they established, on an account signed by you, in which no credit was given for the two and a half per cent. on the gross amount of sales or on the freight; so that I was taken in execution, and was obliged to supersede the judgment, and before this expires, I must apply for an injunction." Now this letter apprized the defendant of the step which had been taken, and that which was to be taken, neither of which could be effected without finding sureties. In answer to the above letter, the defendant wrote to his brother on the 3d of January, 1816, stating that he had a better opinion of the Bosleys than to suppose that they would suppress the letter and account current which he had sent them. It then proceeds: "I owe them only about four hundred francs. Do see to this, and that the affairs be not neglected by those you employ, so that I may be compelled to pay a swindler money which I shall be compelled eventually to regain after a long process, or lose by some want of form." On the 24th of February, 1816, the defendant again writes, "See that your friends in Baltimore do not permit the Bosleys to jockey me out of my money." On the 24th of August, 1817, John Andrews, by letter, informed the defendant that a commission had gone to Bordeaux to take his deposition on Bosleys' suit, and that to render it available, he inclosed him a release. On the 9th of July, 1821, the defendant wrote as follows to John Andrews: "I have forgotten on what ground the Bosleys have attacked you for me. An agent can not be pursued for his principal. I regret that you have committed yourself so as to give them a hold on you." On the 25th of February, 1822, John Andrews wrote to his brother, that an execution on the judgment against himself, Luke Tiernan, and Mr. Owen his sureties, at Bosleys' suit, had been levied on the property of Mr. Tiernan, who had satisfied the same. And on the 27th of April in the same year, the defendant wrote to John Andrews as follows: "I can not conceive how the Bosleys could obtain judgment against you, a mere simple agent who sold my im-

perial license to them." Now after these repeated recognitions of the agency of John Andrews, and that the subject in litigation concerned him, the principal, and him only, I am quite at a loss to conceive upon what ground it can be said that the money paid by the plaintiff, and for which this action is brought, was not money advanced for his use, and at his request.

All that remains is to notice one or two objections which were relied upon by the defendant's counsel. The first was, that this was not a debt due by the defendant, because, in truth, he owed the Bosleys nothing, and this would have been made to appear, if, instead of a confession of a judgment, a trial had taken place. It is alleged, and the effort of the counsel was to satisfy this jury, that the loss now sought to be visited on the defendant, was produced by the neglect of John Andrews, and the mismanagement of the counsel he employed. Now admitting all this to be true, it may well follow that those against whom these charges are made may be answerable to the defendant for the consequences resulting from their alleged misconduct. But what has the plaintiff, a mere surety, neither agent nor counsel, to do with this? To him, it is of no consequence whether the judgment was just or unjust. It was the sentence of a court of acknowledged jurisdiction, and he was compelled to satisfy it. The remaining objection was, that by permitting the plaintiff to step over the head of John Andrews and attack the defendant, the latter is deprived of the opportunity of setting up those defences which he might be able to oppose to John Andrews; if, after a recovery against him by the plaintiff, he should seek for indemnity by such agent, the defendant. But there is nothing real in this objection. If John Andrews be the debtor of the defendant, or if he has by an unfaithful execution of the trust reposed in him, rendered himself liable for damages, the defendant may, in either or both cases, seek his redress against John Andrews. But no good reason can be assigned why the plaintiff may not have his remedy at once against the person whose debt he has been compelled to discharge.

Verdict for plaintiff.
[See Case No 14.025.]